## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 24-cr-96 (JMC)** |
| | : | |
| **MICHAEL ROBINSON,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

M. Robinson pled guilty to conspiring with three other individuals to repeatedly rob the Chinatown Walgreens from July 2023 to February 2024. M. Robinson used his position as a manager at the Walgreens to ensure the robberies' success. Indeed, M. Robinson and his co-conspirators stole over $28,000 in seven separate armed robberies. M. Robinson victimized his colleagues who were unaware of his involvement in the crimes and the Special Police Officers ("SPOs") who were hired after the robberies began. The brazen and dangerous nature of the conspiracy demands a significant sentence of incarceration. For the following reasons, the Government requests a sentence of 225 months' incarceration and restitution, followed by three years' supervised release.

## BACKGROUND

Walgreens is the second-largest pharmacy store chain in the United States and maintains a store at 801 7th Street Northwest in Washington D.C. (hereinafter "Chinatown Walgreens"). Michael Robinson (hereinafter "M. Robinson") was employed as a manager at the Chinatown Walgreens. He, along with his co-conspirators, Kamanye Williams ("Williams"), Gianni Robinson ("G. Robinson"), and London Teeter ("Teeter"), committed seven robberies of the Walgreens on July 18, 2023, August 2, 2023, September 2, 2023, November 10, 2023, December 4, 2023, January 9, 2024, and February 11, 2024. In total, M. Robinson and his co-conspirators

stole at least $28,983.00 from the Chinatown Walgreens through the course of the conspiracy.

*Chinatown Walgreens Layout*

The Chinatown Walgreens is located in the Chinatown neighborhood of Washington, D.C., near the Gallery Place/Chinatown Metro Station and the Capitol One arena, which is a highly trafficked area of the city. The Walgreens itself is comprised of three floors separated by escalators. The main entrance is at the intersection of H Street Northwest and 7th Street Northwest and the rear exit empties into an alley between I Street Northwest and H Street Northwest.



*Figure 1: Google Map of Area Near Chinatown Walgreens*

The basement includes the pharmacy and grocery area that is accessible to the general public, and an employee area that is in the rear of the store. The employee area is separated by a locked door with a code that is only known to Walgreens employees.



*Figure 2: Locked Door Leading to Employee Area (Indicated by Red Arrow)*

Within the employee area is a manager's office (the "Manager's Office") separated by another locked door with a code.  The Manager's Office features a code only known to other managers of the Walgreens, and not individual employees.



*Figure 3: Manager's Office within the Employee Area (Indicated with Red Arrow)*

Employee protocol dictates that an employee bring cash from each cash register to the Manager's Office around close of business each day to account for the store's daily cash flow.

The timing of cash transfers to the Manager's Office may change on a daily basis due to different sections of the Chinatown Walgreens closing at different times (*e.g.*, the pharmacy may close at a different time than the front cash register).

The Chinatown Walgreens was robbed seven times during a nearly eight-month period. Each robbery followed the same *modus operandi*. Specifically, a masked gunman entered the store in the evening as cash was transported, or had already been transported, to the Manager's Office. The gunman then used a firearm and either forced an employee to enter the code to the Manager's Office or accessed the Manager's Office themselves by entering the code. The gunman robbed whichever employee or employees were present in the Manager's Office at the time and fled the store through the rear exit. In total, the robbers made off with nearly $30,000.00 in U.S. currency, and a firearm belonging to an armed Special Police Officer ("SPO").

As discussed below, the two insiders, M. Robinson and Teeter, were both managers at the Chinatown Walgreens and took turns pretending to be the "victim" manager on duty, knowing that the robberies would be captured on internal surveillance footage and later scrutinized by law enforcement. M. Robinson played the role of "victim" during the August 2, 2023, September 2, 2023, and February 11, 2024 robberies, while Teeter did so during the July 18, 2023, and January 9, 2024 robberies. The robberies committed on November 10, 2023 and December 4, 2023 involved real victim employees of the Chinatown Walgreens and SPOs hired to protect the Walgreens after the robberies began.

The evidence shows that Williams was "on call" as the robber when either G. Robinson and/or M. Robinson would text Williams to alert him that the cash in the Manager's Office was

large enough for a big payout.   G. Robinson and M. Robinson both took turns initiating and coordinating the robberies.

*The Conspiracy Begins*

Williams and G. Robinson began orchestrating the first robbery via text messages nearly three weeks prior to its occurrence on July 18, 2023.



*Figure 4: Text From G. Robinson to Williams*

In response to the above message, Williams stated "Aight stop talking bout that sh*t in the messages . . ."   The two discussed the purchase and sale of different types of firearms, where G. Robinson offered to connect Williams, a convicted felon and gun offender,[1] to two different firearm suppliers.   G. Robinson's messages show he considered buying a ghost gun with a "blatt," also known as a switch.[2]

---

[1]    On January 3, 2023, Williams was convicted of Carrying a Pistol Without a License in D.C. Superior Court Case No. 2021 CF2 3217.   His term of supervised probation expired on January 3, 2024.

[2]    A switch converts an otherwise semi-automatic pistol into a fully functioning machinegun capable of automatic fire



*Figure 5: Text Message from G. Robinson*

Williams planned to travel to Virginia to purchase a Glock 27 but said that he needed a "finesse" because he was could not legally purchase it himself (presumably due to his status as a convicted felon).   In response, G. Robinson mentioned that he refused to go through the proper channels to purchase a firearm.





*Figure 6: Text Messages Between G. Robinson (Righthand Side) and Williams (Lefthand Side)*

The discussion continued and G. Robinson even mentioned robbing an individual who purchased a Glock 43 to acquire a firearm. G. Robinson and Williams discussed the most opportune time to rob such a victim and that the robbery would be "cake." On July 1, 2, and 3, 2023, M. Robinson, G. Robinson, and Williams texted about the amount of cash in the Manager's Office. On July 3, 2023, G. Robinson set up a three-way call to provide Williams with access codes for the Manager's Office. G. Robinson relayed that Teeter wanted Williams to act like he knew "exactly what [he's] doing" so that law enforcement would believe it was an employee that performed the robbery, presumably to take suspicion off of Teeter, who would be inside the Manager's Office during the robbery.





*Figure 7: Text Message from G. Robinson to Teeter*

While the Chinatown Walgreens was not robbed that evening, text messages indicate that G. Robinson fell asleep, as Williams claimed he was present in the store that evening.   Williams remarked on July 4, 2023, that the evening was not a waste, however, as he "knows the blueprint now."   From July 4, 2023, to July 11, 2023, G. Robinson and Williams continued to discuss the most opportune times to rob the Chinatown Walgreens, including an agreement to return to G. Robinson and Teeter's residence after the robbery.

The next aborted robbery attempt occurred on July 12, 2023.   G. Robinson advised Williams of insider information learned from Teeter and described the exact steps Williams should take, down to the minute, to rob the Chinatown Walgreens.



12    **Talking to bae about it now**

Apple iMessage
Direction: Incoming
Sender: 12407494228 [12407494228]
Sender Phone: 12407494228
Recipient: C2E7D3B4-523B-4695-A5B7-6A8E155C134A
Message ID: A5ACFA2D-C132-4232-9E13-282A1F65B5F5
Jul 12, 2023, 12:21 PM

12    **Soon as shit get off elevator u gotta be meeting her at office door &
forcing her in the door where the safe & grab everything fast. Up on her
& unc**

Apple iMessage
Direction: Incoming
Sender: 12407494228 [12407494228]
Sender Phone: 12407494228
Recipient: C2E7D3B4-523B-4695-A5B7-6A8E155C134A
Message ID: 04FB34C2-7DE1-4B7B-B57C-9203EB2AFD44
Jul 12, 2023, 12:22 PM

12    **Make one them open safe need book bag don't take mask off till u in
car pulling off**

Apple iMessage
Direction: Incoming
Sender: 12407494228 [12407494228]
Sender Phone: 12407494228
Recipient: C2E7D3B4-523B-4695-A5B7-6A8E155C134A
Message ID: A380D0CD-550F-4A46-8B89-9FBB4AE41B80
Jul 12, 2023, 12:22 PM

12    **Meet her in aisle 1 soon she get off elevator**

Apple iMessage
Direction: Incoming
Sender: 12407494228 [12407494228]
Sender Phone: 12407494228
Recipient: C2E7D3B4-523B-4695-A5B7-6A8E155C134A
Message ID: 14BB0B5F-E536-4394-B475-216535DD990B
Jul 12, 2023, 12:23 PM

12    **U know what she look like right**

Apple iMessage
Direction: Incoming
Sender: 12407494228 [12407494228]
Sender Phone: 12407494228
Recipient: C2E7D3B4-523B-4695-A5B7-6A8E155C134A
Message ID: 8DFF090C-C8B7-47BA-9E77-FAF5E4BDDA92
Jul 12, 2023, 12:24 PM



*Figure 8: Text Messages between G. Robinson and Williams*

Around 8 p.m. that evening, G. Robinson advised that he had a "9" on him, which is believed to be a firearm capable of accepting 9-millimeter ammunition.   While no robbery of the Chinatown Walgreens occurred that evening, text messages show that Williams was unable to travel from his residence in Maryland to the Chinatown Walgreens due to his inability to find a getaway driver.

The duo then discussed robbing the Chinatown Walgreens on July 13, 2023, with G. Robinson specifically noting that there would be ample cash due to a concert taking place nearby. Public records show that Erykah Badu, a prominent singer and songwriter, played at the Capitol One Arena the evening of July 13, 2023.    G. Robinson pushed Williams to move forward with the robbery that evening; however, because Teeter was not on duty until July 18, 2023, it was agreed upon that they hold off.

*First Robbery – July 18, 2023*

On July 18, 2023, an individual wearing a black facemask, black hooded sweatshirt, and

10

grey backpack, later determined to be Williams, entered the Chinatown Walgreens at approximately 9:07 p.m.   After loitering in the store for a period of time and making calls on his cellphone, Williams saw an employee ("Victim-1") open the door to the employee area and ran in behind him with a handgun in his right hand.   Williams then pointed the handgun at Victim-1 and forced him towards the Manager's Office.



*Figure 9: CCTV Still of Williams Following Victim-1 Into Employee Area*
*(Firearm Circled in Red)*

Teeter and one other employee ("Victim-2") were inside of the Manager's Office.   While being held at gunpoint from behind, Victim-1 knocked on the door to the Manager's Office.   At approximately 9:24 p.m., Teeter opened the door.   Williams pushed Victim-1 into the Manager's Office and closed the door behind him.

11



*Figure 10: CCTV Still of Williams Brandishing Firearm and
Forcing Victim-1 into Manager's Office*

Once inside the Manager's Office, Williams held the firearm in his hand and threatened: "Do not do anything" or he would "bust everyone up."   Williams proceeded to push Victim-1 and Victim-2 under desks inside of the Office and placed his backpack next to Teeter.   Teeter unlocked the safe and placing approximately $4,000.00 to $5,000.00 in U.S. Currency into Williams' backpack.



*Figure 11: CCTV Still of Williams Brandishing Firearm and Forcing Victim-1 and Victim-2
under Desk as Teeter Opens Safe*

Williams slung his backpack over his shoulder and fled through the rear entrance of the Chinatown Walgreens.

Texts show that the July 18 robbery was put into motion by Williams and G. Robinson. G. Robinson advised Williams that the Manager's Office would be flush with cash at around 9:00 p.m. that evening.   Williams responded with texts about securing a getaway driver and proceeded towards the Chinatown Walgreens at around 8:31 p.m.

At 8:58 p.m., Williams texted that he was "pulling up."   G. Robinson said that he would see if Teeter was ready.   G. Robinson could not get a hold of Teeter and indicated that he would call M. Robinson instead.   At 9:05 p.m., G. Robinson gave the green light to commence the robbery, as shown below.   Approximately two minutes after giving the green light, Williams entered the Chinatown Walgreens.

13



*Figure 12: Texts between G. Robinson and Williams*

Williams responded that he was "inside now," and "by the cooler" and "by the escalator," but did not see Teeter.   Text messages cease at 9:13 p.m.   The next text message was sent by G. Robinson at 9:34 p.m.: "call me."   The robbery coincided with the stop in texts.

Text messages between Williams and G. Robinson later that evening reveal that they met up in person.   As G. Robinson was waiting for Williams to meet him, they discussed how to split the proceeds from the robbery.   G. Robinson sent the below message:



*Figure 13: Text from G. Robinson to Williams*

In the days after the July 18, 2023 robbery, the Metropolitan Police Department ("MPD") issued a "Person of Interest" video and posted it onto YouTube.   *See* Washington DC Metropolitan Police Department, *Person of Interest in Armed Robbery (Gun), 800 b/o 7th St, NW, on July 18, 2023*, YouTube (July 20, 2023), https://www.youtube.com/watch?v=KZwMQQzhGOM.   The video solicited the help of the general public in identifying the July robber and showed surveillance footage as he walked through the Chinatown Walgreens on the evening of robbery.   On July 22, 2023, G. Robinson sent the YouTube clip to Williams joking that whoever the robber was, he was "looking sweet."

The Cell Site evidence is consistent with Williams acting as the July robber.   Between 6:40 p.m. and 8:30 p.m., Williams's cellphone was located in Maryland.   Between 9:01 p.m. and 9:27 p.m., his cellphone connected to cell towers within the vicinity of the Chinatown Walgreens. By 9:48 p.m., Williams's cell phone was in vicinity of the meetup location explicitly discussed by Williams and G. Robinson.

*Robbery Planning Between July 24 and August 1, 2023*

G. Robinson pushed for another robbery of the Chinatown Walgreens almost immediately, with the plan involving M. Robinson posing as the "victim" in the Manager's Office instead of Teeter.   On July 24, 26, 27, 29, 30, and August 1, 2023, G. Robinson advised Williams that M. Robinson was the manager on duty and that the Manager's Office was flush with cash.   G. Robinson specifically advised that M. Robinson wanted to be "hit" with the firearm on camera, presumably to further convince law enforcement that he was a true victim.

However, due to Williams' inability to find a vehicle or a getaway driver, as well as law enforcement presence in the Chinatown Walgreens on one occasion, the two were unable to rob the store.   Williams and G. Robinson started discussing the need for a permanent vehicle, and Williams stated that he "almost had a free joint today" but an accomplice "f*cked it up."[3]

*Second Robbery – August 2, 2023*

On August 2, 2023, at around 8:55 p.m., the Chinatown Walgreens was robbed at gunpoint while M. Robinson was the manager on duty.   Around this time, M. Robinson walked toward the Manager's Office with the cash register till when he was approached from behind by an individual, later confirmed to be Williams, wearing all black with a black hooded sweatshirt, black facemask, and multi-colored backpack.   Williams pushed M. Robinson into the employee area where M. Robinson entered the code to the Manager's Office.   As M. Robinson and Williams entered the Manager's Office, Williams held a firearm in its left hand.

---

[3]     Text message show G. Robinson discussed a stolen vehicle.   On October 21, 2023, G. Robinson texted M. Robinson, "I'm hit had to pay rent WiFi & electric.   I'm waitin for this lady to buy this handicap sticker I got today from this stolen car."



*Figure 14: CCTV Still Outside Manager's Office of Williams Moving M. Robinson with Cash Till Toward Door*

M. Robinson unlocked a safe in the Manager's Office and emptied multiple cash register tills into William's backpack.   In sum, approximately $6,000.00 in U.S. Currency was put into William's backpack.   As M. Robinson did so, Williams placed his firearm on a chair behind M. Robinson, as seen below in *Figure 12*.



*Figure 15: CCTV Still After Williams Placed Firearm on Chair*

Williams picked back up the firearm before fleeing from the Manager's Office exiting through the rear alley.

Text messages and Cell Site data confirm that K. Williams was the gunman in the August 2, 2023 robbery, and that G. Robinson and Teeter's residence was used as a staging ground prior to and after the robbery.   Cell Site evidence is also consistent with Williams meeting up with M. Robinson after leaving G. Robinson and Teeter's residence.

At around 5:50 p.m., a couple of hours before the robbery, G. Robinson and Williams texted about Williams taking an Uber to G. Robinson and Teeter's residence.   Text messages between G. Robinson and Williams stop after 6:41 p.m. and picked back up after the robbery, at 8:57 p.m., when Williams texted G. Robinson: "I'm down here."

Two days after the August 2, 2023, robbery, Teeter messaged M. Robinson, concerned that

18

the "fake" robbery was not believable after Teeter watched the surveillance footage.





*Figure 16: Texts Between Teeter (Lefthand Side) and M. Robinson (Righthand Side)*

*Robbery Planning Between August and September 2023*

After the August 2, 2023 robbery, G. Robinson continued to pass information to Williams from M. Robinson and Teeter as to the available cash in the Manager's Office, on a nearly daily basis.

Text exchanges show that the co-conspirator discussed ways to make the robberies appear real in the future.   On August 29, 2023, G. Robinson and Williams discussed that Teeter should

no longer play the role of "victim" unless Williams pretends to stage an assault on her.   Williams brazenly claimed that he wanted to "go in violently now, I'm tired of this not hitting what we supposed to hit."   G. Robinson indicated that his "unc" (M. Robinson) is prepared to be the victim and be "smack[ed] out" during the robbery.   (As discussed below, it appears that during the next robbery, that is exactly what then happened, with M. Robinson pretending to be the victim and getting smacked in the head with a firearm.)





Cause I don't want her to freeze up
No unless u push her fake grab her hair n shit

Apple iMessage
Direction: Incoming
Sender: 12407494228 [12407494228]
Sender Phone: 12407494228
Recipient: C2E7D3B4-523B-4695-A5B7-6A8E155C134A
Message ID: DF4C93B3-5C62-4944-AD21-249F4D5C6328
Aug 29, 2023, 7:46 PM



Brodie only way I'm going in violently now I'm tired of this not hitting
what we supposed to hit

Apple iMessage
Direction: Outgoing
Sender: 12407553963 [12407553963]
Sender Phone: 12407553963
Recipient: C2E7D3B4-523B-4695-A5B7-6A8E155C134A
Message ID: 821BFA46-4978-451A-8889-78288F6F92FD
Aug 29, 2023, 7:47 PM



Lmao bet I'm boutta see what unc talking

Apple iMessage
Direction: Incoming
Sender: 12407494228 [12407494228]
Sender Phone: 12407494228
Recipient: C2E7D3B4-523B-4695-A5B7-6A8E155C134A
Message ID: DCAB94C3-5CFC-490B-9824-B64EB5A6754E
Aug 29, 2023, 7:47 PM



We going shoot for Tomar

Apple iMessage
Direction: Incoming
Sender: 12407494228 [12407494228]
Sender Phone: 12407494228
Recipient: C2E7D3B4-523B-4695-A5B7-6A8E155C134A
Message ID: A97B9327-573F-4B3D-B7CB-1564038C5BFC
Aug 29, 2023, 7:52 PM



*Figure 17: Text Messages Between G. Robinson (Lefthand Side) and Williams (Righthand Side)*

### Third Robbery – September 2, 2023

The Chinatown Walgreens was once again robbed at gunpoint on September 2, 2023.   The sequence of events mirrored the July 18, 2023 robbery with two additional details: (1) M. Robinson was in the Manager's Office with one other employee ("Victim-3"), and (2) during the robbery, the masked gunman, later identified as Williams, hit M. Robinson in the head with his firearm.



*Figure 18: CCTV of Williams Hitting M. Robinson with Firearm*

23

Like he did after the July 18, 2023 robbery, G. Robinson again sent a YouTube clip that MPD had issued regarding the robbery to Williams—this time, followed by a laughing emoji.  *See* Washington DC Metropolitan Police Department, *Person of Interest in Armed Robbery (Gun), 800 b/o 7th St, NW, on September 2, 2023*, YouTube (October 19, 2023), https://www.youtube.com/watch?v=KJsgB4EO5eM.

<div align="center">

*Robbery Planning Between September and November 2023*

</div>

In October, the co-conspirators did not carry out any robberies of the Chinatown Walgreens, in part, because G. Robinson and Williams believed that the amount of cash in the Manager's Office was not enough to make it worthwhile.   For instance, on November 1, 2023, G. Robinson expressed that a $1,200.00 cut per person was "too light" to make a robbery worth the trouble.   Nevertheless, between November 8 and November 10, 2023, the two prepared to rob the Chinatown Walgreens once more based on M. Robinson's representation that the Manager's Office would contain more cash.    M. Robinson also texted G. Robinson that they needed to restart their robbery scheme, in part because M. Robinson spent too much money maintaining his Mercedes, which as discussed below, was used in the November 10, 2023 robbery.

<div align="center">

*Fourth Robbery - November 10, 2023*

</div>

On November 10, 2023, the co-conspirators robbed the Chinatown Walgreens for the fourth time.   Notably, this was the first robbery where neither Teeter nor M. Robinson were present in the Manager's Office at the time of the robbery.   Immediately before the robbery, an individual, later confirmed to be Williams, arrived in a White Mercedes and used a rented Lyft scooter to travel to the Chinatown Walgreens.   That White Mercedes was recovered at M. Robinson's residence at the time of his arrest, and Lyft records show the scooter was rented by M.

<div align="center">24</div>

Robinson.

Williams rode the scooter to the Chinatown Walgreens and entered the store at approximately 9:00 p.m. Williams wore a white hooded sweatshirt, a black facemask, and a black Reebok branded backpack. Williams proceeded directly to the Manager's Office. When Williams got to the door with the keypad, he looked at his cellphone as he entered the code into the locked door.



*Figure 19: CCTV Still of Williams Entering Code to Manager's Office*

At approximately 9:15 p.m., Williams entered the Manager's Office and pointed a silver handgun with a black tip at the employee who was counting cash from the day (hereinafter, "Victim-4"). Williams stated, "give me all the money, it's not even yours, hang up the phone." Williams placed approximately $7,700.00 in U.S. Currency into his backpack before fleeing from the office and exiting through the rear alley. Based on external surveillance footage, Williams put a dark outer layer of clothing over his white sweatshirt as he fled. Williams was picked up by

25

the same White Mercedes from earlier, which ultimately drove to and parked outside of the Meridian apartment complex at 450 Massachusetts Avenue Northwest.

Text messages confirm that Williams was the gunman for the November 10, 2023 robbery. On the day of the robbery, at 3:09 p.m., M. Robinson texted Williams: "today is the day."   At 3:16 p.m., Williams texted G. Robinson: "Unc say that sh*t green light today [laughing emoji]." Around 9:04 p.m., around the time of the robbery, Williams advised M. Robinson of security stationed at the door.



*Figure 20: Text Messages Between Williams (Lefthand Side) and M. Robinson (Righthand Side)*

Once the robbery was completed, G. Robinson texted Williams complaining about the amount of cash in the Manager's Office and that his cut would only be $200.00.   The day after the robbery, G. Robinson texted Williams that the local media had picked up the story on the robbery and that he told M. Robinson to wait on carrying out another robbery.   In response, Williams, sent the below message:



*Figure 21: Text Message from Williams to G. Robinson*

Cell Site data shows that M. Robinson and Williams's cellphones were near M. Robinson's residence prior to and after the robbery.   The two cellphones were also in the vicinity of the scooter rental and the Chinatown Walgreens at the time of the rental and robbery, respectively.

*Robbery Planning Between November and December 2023*

Two days prior to the December 4, 2023 robbery, M. Robinson texted Williams, offering to drop off a firearm at G. Robinson and Teeter's residence.   M. Robinson also said that he would drop off the "Chopstick," a slang term for an assault rifle.

On December 3, 2023, Williams entered the Chinatown Walgreens and attempted to rob the store.   Ultimately, the robbery did not happen because Williams realized that there were two armed SPOs stationed at the store and M. Robinson did not know the Manager's Office code because it was changed after his shift.   Disturbingly, M. Robinson suggested to Williams that he enter violently and "cook they ass."

*Fifth Robbery – December 4, 2023*

On December 4, 2023, at approximately 7:43 p.m., an armed SPO and a Walgreens employee ("Victim-5" and "Victim-6") were transporting a cart containing cash register drawers to the Manager's Office.   Upon arriving at the door leading into the hallway outside of the office, an individual, later determined to be Williams, wearing apparel similar to the robber in prior robberies, grabbed Victim-5's jacket and produced a black and silver handgun.   Williams removed Victim-5's handgun from the holster and demanded that Victim-5 and Victim-6 open the Manager Office's door.



*Figure 22: CCTV Still of Williams, Victim-5, and Victim-6 Outside of the Manager's Office*

Upon entering the Manager's Office, Williams said: "You know what the drill is.   Give it all!   I want all of it!"   Victim-6 grabbed the money and placed it into William's grey backpack. In sum, approximately $5,000.00 in U.S. currency, as well as Victim 5's firearm, were taken.



*Figure 23: CCTV Still of Williams, Victim-5, and Victim-6 Inside the Manager's Office (Victim 5's Firearm Circled in Red)*

Williams exited through the back of the store via an elevator at approximately 7:48 p.m.

On the morning of December 4, 2023 robbery, M. Robinson texted Williams, "Everything in place brodie" and "Brodie it's a go." Thirty minutes before the robbery, Williams texted G. Robinson at 7:15 p.m. to "come downstairs." Two minutes before the robbery, at 7:41 p.m., Williams told M. Robinson, "I'm about to walk in."

Cell Site shows that Williams and G. Robinson's cellphones were both in the vicinity of G. Robinsons and Teeter's residence immediately prior to the robbery. During the robbery, Williams' cellphone moved to the vicinity of the Chinatown Walgreens. Immediately after the robbery, at 7:54 p.m., Williams' cellphone called G. Robinson cellphone. At that time, the two cellphones were back in the vicinity of G. Robinson and Teeter's residence. At approximately 8:13 p.m., G. Robinson cellphone called M. Robinson cellphone. At that time, the two cellphones

were near M. Robinson's residence.   At approximately 9:02 p.m., M. Robinson's cellphone, Williams' cellphone, and G. Robinson's cellphone had moved to the area of Williams' residence.

*Robbery Planning Between December 2023 and January 2024*

In the days leading up to the next robbery on January 9, 2024, M. Robinson continued to provide Williams with insider knowledge of the Chinatown Walgreens, telling him the number of armed security guards present at a given time, which employees had the code to the Manager's Office, when cash would enter the Manager's Office, and the best times to perform a robbery. On January 7, 2024, two days prior to the robbery, Teeter and M. Robinson discussed the amount of cash currently in the Manager's Office.   Specifically, Teeter advised M. Robinson that the Manager's Office held $6,000.00 in U.S. Currency with an additional $1,000.00 in quarters.   She also relayed that information to G. Robinson.   On January 6, 7, and 8, 2024, Williams performed reconnaissance inside the Chinatown Walgreens while texting G. Robinson and M. Robinson.   At one point, Williams asked G. Robinson to be the getaway driver for Williams.   In response, G. Robinson said, "just tell me where to park."

*Sixth Robbery – January 9, 2024*

On January 9, 2024, at approximately 7:25 p.m., G. Robinson and Williams walked through the lobby of G. Robinson's and Teeter's residence in Washington D.C.   Williams was wearing the same black Reebok branded backpack as in the prior robberies.   After exiting the lobby, G. Robinson and Williams got into a Black Cadillac matching the description of a Black Cadillac later seen by law enforcement at Williams's residence.

At approximately 8:03 p.m., an individual, later determined to be Williams, approached a Walgreens employee ("Victim-7") who was being escorted by an SPO ("Victim-8"), while

pointing a firearm and directing Victim-7 and Victim-8 to go back through the employee area to the Manager's Office. Victim-7 knocked on the Manager's Office and Teeter opened the door. (M. Robinson was also working in the store at that time on the first floor.) Williams forced Victim-7 and Victim-8 inside the Manager's Office and held them at gunpoint while demanding Teeter empty the cash in the drawers into his black Reebok backpack.



*Figure 24: CCTV Still of Williams Brandishing a Firearm (Circled in Red) Inside the Manager's Office with Victim-7, Victim-8, and Teeter*

During the robbery, Williams repeatedly asked Victim-8 where their firearm was, which was hidden under Victim-8's jacket. Teeter emptied approximately $3,000.00 into Williams' backpack and Williams fled the store through the rear entrance at approximately 8:05 p.m. An individual in a Black Cadillac picked Williams up after he exited the Chinatown Walgreens, exactly where Williams was picked up after the November 10, 2023 robbery.

After the January 9, 2024 robbery, Williams again complained to G. Robinson over text that the cash after their split was too light – $1,060 excluding quarters. G. Robinson also texted

Williams that he should have robbed Victim-8 during the robbery.  In response, Williams said, "it's aight I got her ass next go round."  Williams then said they should bring the "chop stick" (assault rifle) because they are getting "hand joints" (free handguns) out of the robberies. Specifically, Williams said: "Why we need to grab that chop stick we get hand joints for free around here [laughing emoji]."

Cell Site shows that Williams and G. Robinson traveled together from G. Robinson and Teeter's residence to the area of the Chinatown Walgreens around the time of the robbery, and then traveled together after the robbery to Williams' residence.  Their respective cellphone locations indicate that M. Robinson, G. Robinson, and Teeter all met up at G. Robinson and Teeter's residence later that evening.

*Seventh Robbery (and Shooting of Williams) – February 11, 2024*

On February 11, 2024, at approximately 6:28 p.m., an armed SPO ("Victim-9") was escorting M. Robinson to the Manager's Office while carrying cash from the day.  M. Robinson put in the code to the Manager's Office when Williams came up and pressed a firearm against Victim-9 and threatened to kill him.   M. Robinson, Williams, and Victim-9 entered the Manager's Office and Williams took Victim-9's firearm and the cash brought in by M. Robinson.

After putting the cash in his bag, Williams attempted to leave the Manager's Office but a second armed SPO arrived and fired once at Williams, striking him in the chest.    Williams was then taken to the hospital.

Call logs show that immediately after the shooting, M. Robinson's first call was to G. Robinson. G. Robinson then went to the hospital where Williams was being treated.  At the hospital, law enforcement saw G. Robinson standing outside of the Emergency Room.

**ARGUMENT**

The Government requests that the Court sentence M. Robinson to 226 months of incarceration followed by three years of supervised release.   M. Robinson conspired to rob his employer seven times over an eight-month period and subjected his colleagues to seven armed robberies.   Both the Guidelines and sentencing factors pursuant to 18 U.S.C. § 3553(A) favor a lengthy period of incarceration.

## I.    THE APPLICABLE SENTENCING GUIDELINES

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49 (2007).   Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018).   The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors.   *Gall v. United States*, 552 U.S. 38, 49–50 (2007).   The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

M. Robinson pled guilty to Count One and the lesser included offense of Count Seven. ECF No. 57.   The parties agree that the applicable Guidelines for Count One are:

| Count One: Conspiracy to Interfere with Interstate Commerce (18 U.S.C. § 1951) | | |
|---|---|---|
| Base Offense Level | 20 | U.S.S.G. § 2B3.1 |
| Firearm "Otherwise Used" | +6 | U.S.S.G. § 2B3.1(b)(2)(B) |
| Firearm Taken/Object of Offense | +1 | U.S.S.G. § 2B3.1(b)(6) |
| Official Victim | +6 | U.S.S.G. § 3A1.2 |
| Grouping Analysis[4] | +4 | U.S.S.G. § 3D1.4 |
| **Total** | | **37** |

Additionally, the parties agree that, pursuant to U.S.S.G. § 2K2.4(b), the Guideline sentence for Count Seven[5] is 60 months' incarceration.

Thus, the total offense level, after applying a three-level reduction for acceptance of responsibility, is **34**. Paired with a criminal history category of I,[6] the resulting Guideline range as to Count One is 151 to 180 months of imprisonment. However, given that 60-month mandatory minimum sentence as to Count Seven must run consecutive to Count One, the resulting range for both Counts One and Seven is **211 to 240 months**, and a potential fine of $35,000 to $250,000.[7]

## II.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In addition to the applicable guideline range, the Court should consider the factors listed in 18 U.S.C. § 3553(a):

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
> (A) to reflect the seriousness of the offense, to promote respect for the

---

[4]    The government disagrees with U.S. Probation's calculation of the total offense level, as discussed more fully in the government's Notice of Objections (ECF No. 74).

[5]    The plea agreement (ECF No. 57) contains a typographical error on page three, listing the count of conviction as Count Five instead of Count Seven.

[6]    The government agrees with U.S. Probation that M. Robinson's criminal history score is I because the only counted conviction is Failure to Register a Firearm in D.C. Superior Court Case No. 2013 CDC 016301.   ECF No. 72 at 14-16.

[7]    The government agrees with U.S. Probation that the maximum fine for a felony, pursuant to U.S.S.G. § 5E1.2, n.2, and 18 U.S.C. 3571, is $250,000.

law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –
(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
(i) issued by the Sentencing Commission . . .; and
(ii) that, . . . are in effect on the date the defendant is sentenced; . . .

(5) any pertinent policy statement –
(A) issued by the Sentencing Commission . . . and
(B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

**A. The Nature and Circumstances of the Offense**

It is difficult to overstate the seriousness of M. Robinson and his co-conspirators' offenses. M. Robinson used his position as a manager at Walgreens to exploit the security system and steal from the very company writing his paycheck.    He did this not once, not twice, but seven times. Unlike a typical Hobbs Act robbery where the perpetrator may pick a store at random and have no personal relationship with their victims, M. Robinson worked with and knew the employees who he victimized.    M. Robinson may brush this off, and tell himself that, because he planned the robberies, he knew that no one would *actually* get hurt.    Any claim that violence was not a possibility is belied by the facts, the victims' accounts, *see* Exhibit B, and the shooting of Williams during the last robbery.    Moreover, the robberies were repeated, brazen, and escalated over time.

As M. Robinson and his co-conspirators continued their scheme, they increased the amount of violence used and the risks they were willing to confront to carry out the robberies.   Williams began by pointing a firearm at the victims, then used the firearm to hit his co-conspirator, and ultimately, stole firearms from the SPOs hired to stop him.   Indeed, the texts between the co-conspirators—especially the disturbing messages between Williams and G. Robinson after the January robbery—demonstrate their willingness to use actual violence against the victims and escalate their conduct.

Another aggravating circumstance is the location and popularity of the Walgreens.   The store is located across from a highly-trafficked metro station and is one block from Capitol One Arena, where large concerts and sporting events regularly take place.   In fact, such events influenced which days the co-conspirators would rob the Walgreens because of the increased cash flow.   M. Robinson and his co-conspirators were not only placing their fellow employees in harm's way, but the many customers patronizing the store at any given time.   While much of the "action" was carried out in the Manager's Office, Williams entered the store each time with a firearm and showed little apprehension in confronting armed SPOs.   It is not difficult to imagine a scenario where the situation escalates (and indeed it did, resulting in Williams being shot by the SPO).

The amount of loss to Walgreens was also significant.   M. Robinson and his co-conspirators stole approximately $28,983.00 in cash from the Walgreens over the eight-month period.   However, the co-conspirators actions led Walgreens to upgrade their security systems, including surveillance footage, reinforce entry points, and hire armed SPOs.   In total, the cumulative financial impact on Walgreens was over $198,000.   *See* Exhibit A.

Given the number of robberies, the dangerousness they posed to the victims and customers, as well as the abuse of trust involved, the nature of the offense justifies a significant term of incarceration.

### B.  M. Robinson's History and Characteristics

M. Robinson is 34 years old, a lifelong residence of the District of Columbia, and G. Robinson's uncle.   Final Presentence Investigation Report ("PSIR") at 2, 6.   As explained in the PSIR, M. Robinson had a difficult upbringing.  *Id.* ¶¶ 121-30.   His father was absent and his mother suffered from addiction.   *Id.*   M. Robinson suffered verbal and physical abuse at the hands of his mother's boyfriends and from PTSD related to events that occurred during his childhood.   *Id.*

While the instant robbery scheme is not M. Robinson's only criminal conduct, it marks a sharp escalation from his prior, somewhat dated, criminal history.  *See id.* ¶¶ 110-12.   M. Robinson's adult criminal history began in 2013, when he was 23 years old, with a conviction for Failure to Register a Firearm.  *Id.* ¶ 111.   Three years later, M. Robinson picked up two convictions for Contempt of CPO/TPO.  *Id.* ¶ 112.   From 2016 to 2023, M. Robinson has no criminal convictions, making his foray into this series of armed robberies all the more perplexing.

M. Robinson is at an age when he can no longer blame his criminal behavior on his youth. He is the oldest of the co-conspirators—the rest of whom are in their early to mid-20s.   M. Robinson is also the uncle to G. Robinson.   Instead of using his maturity and relationship to G. Robinson to set an example, M. Robinson leveraged both to carry out a sophisticated robbery scheme.   M. Robinson claims that he participated in the robberies to pay for his drug habit.  *Id.* ¶ 140.   While his motivation for the robberies does not absolve him, it certainly sheds light on his

willingness to engage in such reckless and dangerous conduct.

M. Robinson's difficult upbringing provides important context for his criminal behavior. However, given his prior criminal history (although dated), age, and relationship to his co-conspirators, on balance M. Robinson's history and characteristics weigh slightly in favor of incarceration.

### C.  The Need for the Sentence Imposed

The requested sentence of 225 months incarceration, which represents the midpoint of the Guideline range, is sufficient but no greater than necessary to meet the goals of sentencing.   The sentence provides specific deterrence: it will keep our community safe from M. Robinson for a significant period of time and will hopefully make M. Robinson think twice before engaging in such criminal conduct after his release.   For the past several years, M. Robinson's record is devoid of criminal convictions.   This case represents a pivotal moment for M. Robinson—he can continue down his current path of escalating criminal conduct.   Or, he can embrace this sentence as a wakeup call and take advantage of the tools available during his incarceration and through U.S. Probation to address the underlying issues that drove him to participate in such a dangerous conspiracy.

Further, a lengthy sentence provides general deterrence: it signals to the community that brazen and reckless criminal conduct, especially while armed with a firearm in a busy area of the District, is a serious offense that engenders a serious sentence.   To award a short sentence would therefore send the opposite signal: that individuals like M. Robinson can abuse their position of trust, carry out a relentless string of robberies resulting in significant financial loss, and get a slap on the wrist.

Given the strong need for both specific and general deterrence, the requested sentence of 225 months of incarceration is a reasonable one that secures the goals of justice.

### D. Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.  *Papagno*, 639 F.3d at 1096.   The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii).  *See Fair*, 699 F.3d at 512 (citation omitted). Here, M. Robinson was convicted of a violation under Title 18; accordingly, the VWPA applies.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.  *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and

"shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[8]

Because M. Robinson co-conspired with three other individuals to rob the Walgreens of $28,983, Exhibit A, his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that

---

[8]    Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

underlies the victim's general losses").    *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").    Here, the government submits that M. Robinson is responsible for $7,245.75 (one fourth) of the total amount stolen in cash from the Walgreens.    Accordingly, the government asks that the Court order restitution in that amount.

## CONCLUSION

For all the foregoing reasons, the Government respectfully requests that the Court impose a sentence of 225 months of incarceration and restitution, followed by three years of supervised release.

<div style="margin-left:40%">

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

</div>

By:    /s/ *Sarah Martin*
       Sarah Martin
       Assistant United States Attorney
       D.C. Bar 1612989
       601 D Street NW
       Washington, D.C.
       (202) 252-6775
       Sarah.Martin@usdoj.gov